### Joseph Pfeiffer v. The Chicago, Milwaukee & St. P. R. Co.

1. INSTRUCTIONS—*To Find for the Defendant, When Proper.*—Where it appears from the evidence in an action against a railroad company for personal injuries that the company has been guilty of no negligence, a recovery can not be sustained, and it is proper to instruct the jury to find for the defendant.

2. PRESUMPTIONS—*Railroad Employees—Ordinary Hazards.*—A railroad employee assumes the ordinary risks and hazards of the employment. The presumption is, that he understands the nature and dangers of the employment when he engages in the service, and if not, that he will inform himself.

**Trespass on the case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. JOHN BARTON PAYNE, Judge, presiding. Heard in this court at the October term, 1897. Affirmed. Opinion filed February 14, 1898.

E. A. MEYER, F. M. WILLIAMS, attorneys for appellant.

CHARLES B. KEELER, attorney for appellee. GEO. R. PECK, of counsel.

Frequent attempts have been made to convict railroad companies of negligence on the mere ground of the speed at which their trains have been run. But it has never been, and we trust never will be, established as a rule of law that any conceivable rate of speed is

*per se* evidence of negligence. The whole object of the railroad system is to attain a high speed of travel. 2 Shear. & Redf. on Negligence (4 Ed.), 248, Sec. 460, and cases in note; McKonkey v. Chicago, B. & Q. R. R. Co., 40 Iowa, 206; Cohoon v. Chicago, B. & Q. R'y Co., 90 Iowa, 169; Maher v. Atlantic & P. R. R. Co., 64 Mo. 275.

The accident itself constitutes no proof, and raises no presumption of negligence in any respect. Illinois C. R. R. Co. v. Houck, Adm'r, 72 Ill. 286; East St. Louis Packing & P. Co. v. Hightower, 92 Ill. 139; Sack v. Dolese et al., 137 Ill. 139; Joliet Steel Co. v. Shields, 146 Ill. 603; Mobile & O. R. R. Co. v. Godfrey, 155 Ill. 82; Myers v. American Steel Barge Co., 64 Ill. App. 187.

Verdicts must have evidence to support them, and must not be founded upon mere theory or supposition. Atchison, etc., R. R. Co. v. Alsdurf, 68 Ill. App. 152; Bothwell v. Chicago & St. P. R'y Co., 59 Iowa, 192.

Mr. Justice Windes delivered the opinion of the Court.

Appellant, an employee of appellee as a section hand, was injured on August 31, 1891, while on a handcar being propelled by the section crew, by appellee's engine, and brought suit to recover damages. On a trial had before the Superior Court and a jury, at the close of plaintiff's evidence, on motion of appellee, the court instructed the jury to find a verdict for appellee, which was done, and judgment rendered on the verdict. Appellant has appealed, and claims that the trial court erred in instructing a verdict for appellee, and in rendering judgment thereon.

The negligence charged is that appellee, by its servants (not fellow servants of appellant), willfully, carelessly and improperly drove said engine and car

attached toward and upon said handcar, etc., *per quod* appellant was thrown from said handcar over an embankment or grade to and upon the ground below, and injured, etc. Appellee pleaded the general issue, and a special plea not here in question. The evidence as to the manner of the accident was, in substance, viz.:

Joseph Pfeiffer, the plaintiff, testified: "I am the plaintiff in this cause. The latter part of August, 1891, I was working for the Chicago, Milwaukee and St. Paul Railway Company on section work. I recollect the thirty-first of August, 1891. I started to work that morning at 7 o'clock. We rode to the place of work on a handcar, leaving Elgin ten or fifteen minutes after seven. There were eleven men on the handcar; the section foreman was Pat Moran. Ten minutes before 8 o'clock we were at the bridge, over which the Chicago, Milwaukee and St. Paul crosses the Northwestern road; no trains passed us going to the bridge. When close to the bridge a man called out 'a train is coming.' I stood in the middle with my back toward the machine, toward the engine. There is a sharp curve a quarter of a mile before the bridge. (It is agreed that at and near the place of the accident the Milwaukee track in question extended in a westerly direction, and there crossed over the Chicago and Northwestern Railroad track by means of an overhead viaduct or bridge). The Northwestern track was running at the bottom of and lengthwise of the ravine, north and south, and the Milwaukee track crossed above it on this viaduct, and the Milwaukee track ran on an embankment that had been built up there, and the embankment was sufficient to make a proper approach to the trestle, so that the Milwaukee track at the bridge and approach was higher than the valley or ravine which it crossed. The handcar just went into

Pfeiffer v. C., M. & St. P. R'y Co.

the bridge when a man called out 'a train is coming.' The handcar was eight or ten feet on the bridge. As soon as I heard the man call out, I looked around to see if I could jump, but I could not do it any more. Right after that I turned around, and I saw it coming.

"Q. How far was the engine from the handcar at that time?

"A. 600 feet.

"Q. How rapidly was the handcar moving?

"A. We went terribly fast. As fast as an ordinary train.

"THE COURT: You were on the same track with the engine were you?

"A. On the rails, yes, sir.

"Q. 600 feet away, did you say?

"A. Yes, sir.

"MR. WILLIAMS: How fast was the engine going at that time?

"A. Fifty-two miles an hour.

"The bridge was about 130 feet long. After we looked around and saw the engine, we worked as fast as we could to get off the bridge. When we got to the further end of the bridge the engine caught us. At the moment we left the bridge the engine struck the handcar and gave me a shove and we flew off the handcar. There were eight men on the handcar at that time. The foreman was among them. I was thrown off down to the fence, thirty-five feet. I was dizzy and didn't know what happened. After the engine struck the handcar it took it along; the engine took it along 900 feet.

"Q. Can you state whether or not the engine stopped after carrying the handcar 900 feet away?

"A. It stopped alone, and there it stood.

"Q. What condition, if you know, was the handcar in at that time?

"A.  Everything was broken.  It was a Chicago, Milwaukee and St. Paul engine that struck the handcar.

"I worked for the railroad four days before I was hurt.  I worked for the Chicago, Milwaukee and St. Paul; I never worked for the Chicago, Milwaukee and St. Paul before as a section hand.  The first day we laid ties; I was hired to lay the tracks.

"The work I was hired to do required me to be around the railroad tracks.  I lived in Elgin.  Every morning we would go to work along the track on this handcar.  I would help to pump the handcar.  Trains would come along during the day; trains would pass us while at work on the track.  I watched for trains. I watched for trains in the direction I was standing.  If a train was coming, we could take the handcar from the track quick enough.  While I kept watch in one direction, the other section men kept watch in the other direction.  I could not tell when trains were coming except by keeping watch.  Just before we started that morning a train went west.  When the train went west that morning we stopped in the tool house at Elgin.  That train was a regular train.  It came every day.  I don't know whether it carried green flags or not.  I did not see it.  I was in the tool house.  Eleven men started on the handcar.  I faced west.

"I kept watch towards the west for trains; the others kept watch for trains from the east.  I did not know when we started when the next train would come nor from what direction it would come.  For my part I looked out, so I am not run over.  Our section was from Elgin to McQueen.  We were on our own section. We had picks and shovels on the floor of the handcar. They did not make a noise.  We could hear if a train was coming.  There are a good many curves in the track between Elgin and McQueen.  I do not know

how many. There are several other sharp curves on the track just east of the bridge. The train goes on this curve through a cut, before it gets on the bridge. We kept watch when we got to that curve just east of the bridge. The handcar was going like a slow freight train. We did not stop near the curve. We got about eight feet on the bridge when this man called out a train was coming. I do not know how many miles an hour the handcar was going. I do not know which way the man was facing who called out a train was coming. I looked back east. When I looked back I saw the train.

"Q. How far away was it then?

"A. Eight rails long—that is 240 feet. It had come around the curve and through the cut. It was plain in sight when we looked around. I think the train was going fifty-two miles an hour. I can not tell exactly. I am not an expert. I did not try to get off the handcar then. We all tried to go faster and get over the bridge, and got clear over the bridge onto the ground before the train came to us. I didn't get off that handcar before the engine struck it. There were eight men on the handcar with me when the engine struck it. It threw me down into the ditch. I wanted to jump. I was standing in the middle."

Adolph Rossdeutscher, a witness for plaintiff, testified: "I was one of the section gang. I was on the handcar when Pfeiffer got hurt. We commenced work ten or fifteen minutes after 7 in Elgin at the tool house. We went from Elgin to Elmora on the handcar. Elmora is four miles from Elgin. There are ten to twelve men on the handcar from Elgin to Elmora. The bridge is nearly a mile from Elmora. There were on the car nine men, I think. The others left the car a short ways before Elmora. I was on the handcar when the engine came along. This was six to eight

feet from the bridge. The engine came right around the curve, I think abot 180 feet. I was on the front side facing toward Elgin. That was west. The car was east of Elgin. The locomotive was east of Elgin. I had my face toward the train. A man hollered to me 'there is an engine coming.' It was one of the employees on the handcar.

"Q. What did you do then?

"A. The foreman said 'hurry up, hurry up,' to go over the bridge. But they could not get over the bridge any more. They could not jump this side of the bridge. The ground was about eighteen or twenty feet down. I did not see Pfeiffer get off. I did not see any of the rest get off either. According to my idea the engine was going over fifty miles an hour. The engine run after it struck the handcar 200 to 300 meters. Between 200 and 300 yards.

"Q. Where was the handcar when the engine stopped?

"A. On the cow catcher.

"Q. Did you see the handcar afterward?

"A. I seen it after I got up. The handcar was all broken.

"Q. Did you hear the bell rung or whistle sounded as the engine came around that curve?

"A. I didn't hear any bell or whistle. I worked repairing tracks. Our section was from Elgin to Elmora. It extended about five miles. Our section crew went over the section every day. Sometimes trains would come along. When they were coming we would take the handcar off the track. We kept watch to see if any trains were coming along. The only way we could tell was by watching. Some watched east and some west. There are sharp curves on the track. The country was hilly and there are woods on the side

of the track. There we kept a sharp lookout for trains. There is a sharp curve just east of this bridge, a pretty sharp curve. It is near the bridge, but I can't tell exactly how near. That sharp curve just east of the bridge is in a cut. The bridge is about three rails in length. We tried to get over the bridge, but we didn't see the train. We could see the train just from the curve.

"Q. Were you on the bridge when you saw the engine come out of the curve?

"A. We was on the bridge, at the east end.

"Q. Now, did you try to stop or did you hurry up to get over before the train got there?

"A. Yes, the section foreman says, 'hurry up, hurry up.' That was after we got on the bridge.

"Q. You had to hurry up and get where you could get off, did you?

"A. Yes, we had to hurry up to get over.

"Q. Your handcar got off the bridge before the train got there, didn't it?

"A. No.

"Q. Did you have time after you saw the train to get to a place where you could get off?

"A. No."

August Witt, for plaintiff, testified: "This locomotive engine and caboose was moving in the same direction as the handcar. There is a curve before you get to the trestlework. The track is nearly all curves. On the side of the curve there is a forest; that is what we would call a hollow side to the curve. You could see a train coming from the east 600 feet. When I saw it, it was about fifteen rails—450 feet. The other men saw it before I did. I was standing with my face west to it.

"Q. Well, when you saw the engine approaching the handcar, what did you do?

"A.   The foreman told us to 'hurry up, boys, and get across the bridge.' We wanted to get across the bridge as we could not jump then. The bridge was seven or eight rails long. I could not tell how long. It was over four rails long. There was not very much room there. Just room for one track. That is all. I jumped from the car to the ground. It was about four or five feet where I jumped. I jumped on the north side; some jumped on the south side. I do not know where the other fellows rolled to. I did not see where they went to. That is where railway track is about level, you call that a dump. It is kind of high there. The engine ran about 500 feet after it struck the car. When I jumped up they were picking the handcar off the cow catcher. I did not hear any whistle blown that morning. I did not hear any bell ring. We could hardly hear a bell rung fifty rails that morning; it was rather foggy. I do not know how far we could hear it ring. We could hardly hear it fifty rails this morning. The handcar was going about eight or nine miles an hour. The engine and car attached was running pretty fast. Joseph Pfeiffer was a section hand in the gang. The gang lived at Elgin. We did work wherever the foreman directed and would go to our work on the handcar. When we finished work at one place, we went to another. The section crew worked the handcar. We would meet trains running on the same track in one direction or another. When the trains would come from another direction they would take the handcar off. The crew was liable to meet a train anywhere on the track. We could not tell when trains would come along except by watching for them. That morning was rather foggy, and we could not see or hear as well as on a clear morning. Any train was liable to run in one or more sections on any day. This train ran in two sections that day.

The train that struck the handcar was the last section; before we left Elgin that morning I saw a section go out. The crew were in the tool house. The engine on the section that went out had green flags, which indicated that another section was coming. Pfeiffer was in the tool house. Our car started ten or fifteen minutes after that section went out. Our crew could not tell how soon any section would come without keeping watch for it. Henry Strandt was facing east; that is the direction the train would come from. When we got near the east end of the bridge, we did not check the speed of the handcar; we were moving right along. Henry Strandt first saw the train. We were then about fifteen or twenty feet on the bridge. The handcar was going about eight or nine miles an hour. There was no place where we could get off the track.

"Q. What did you have to do before you could get off the track?

"A. What did we have to do? We had to hustle up and get across the bridge, so that we could jump. There was only one way that we could do.

"Q. What did the foreman say to the crew?

"A. 'Hustle up, boys, and let us get across the bridge.'

"Q. Was there anything else they could do and save themselves?

"A. No, we couldn't do anything.

"Q. Before you saw the engine coming, had you paid any attention to listen for a whistle?

"A. No.

"Q. You don't know whether or not the engineer actually did sound the whistle before you saw it, do you?

"A. No.

"Q. So all that you know is, that after you saw the engine close at hand, it didn't afterwards whistle?

"A. No. The shovels and picks make some noise on the handcar."

We think it is clearly apparent from this evidence that appellee was guilty of no negligence in running its train as it did; that it owed no duty to appellant to run its train at a less rate of speed than is shown; that it fails to appear that the accident was caused by reason of a failure to ring a bell or sound a whistle, if there was failure in that regard, and that the danger to which appellant was exposed, to wit, the running of a train on appellee's road at a rapid rate of speed at any time, without the ringing of a bell or the sounding of a whistle, was a risk which he assumed when he entered appellee's employ as a section hand.

It is needless to recapitulate the evidence. It is sufficient to say that under all the circumstances shown, appellee is not liable for any negligence which is not willful, or such reckless carelessness as would amount to willfulness. There is no evidence or willful negligence. There is no evidence that appellee's train could have been stopped sooner than it was stopped, nor that the engineer saw the handcar in time to have avoided the accident, or at any time before the accident. Williams v. R'y Co., 135 Ill. 496; R. R. Co. v. Arias, 30 S. W. Rep. 447; R. R. Co. v. Peterson, 32 Ill. App. 139; R. R. Co. v. Johnson, 103 Ill. 520; Stafford v. R. R. Co., 114 Ill. 247, and cases cited; R'y Co. v. Clark, 108 Ill. 118; R. R. Co. v. Wachter, 60 Md. 395; Jolly v. R'y Co., 93 Mich. 370.

The case of R'y Co. v. O'Connor, 77 Ill. 391–4, especially relied on by appellant, is clearly a different case from the one at bar, in that the engine in that case was being run within city limits, "tender foremost, at a high rate of speed (15 to 40 miles per hour), in violation of the city ordinance," which prohibited

trains or engines from running at a greater rate of speed, in the city limits, than six miles per hour. The judgment is affirmed.